[Cite as *State v. Velez*, 2014-Ohio-4269.]

STATE OF OHIO            )          IN THE COURT OF APPEALS
                         )ss:       NINTH JUDICIAL DISTRICT
COUNTY OF LORAIN         )

STATE OF OHIO                       C.A. No.       13CA010370

    Appellee

    v.                             APPEAL FROM JUDGMENT
                                    ENTERED IN THE
DAVID VELEZ                         COURT OF COMMON PLEAS
                                    COUNTY OF LORAIN, OHIO
    Appellant                      CASE No.       10CR080155

DECISION AND JOURNAL ENTRY

Dated: September 29, 2014

---

BELFANCE, Presiding Judge.

{¶1}   Defendant-Appellant David Velez appeals from his conviction for falsification. For the reasons set forth below, we affirm in part and reverse in part.

I.

{¶2}   Mr. Velez was indicted on one count of bribery in violation of R.C. 2921.02(B), a third-degree felony, one count of falsification in violation of R.C. 2921.13(A)(3), a first-degree misdemeanor, and one count of soliciting or receiving improper compensation in violation of R.C. 2921.43(A)(1), a first-degree misdemeanor.  The matter proceeded to a bench trial during which the trial court granted a Crim.R. 29 motion with respect to the bribery and soliciting or receiving improper compensation counts.  Ultimately, the trial court found Mr. Velez guilty of falsification and sentenced him to 180 days in jail, which was suspended on the condition that a fine and court costs were paid prior to June 25, 2013.  Mr. Velez has appealed, raising three assignments of error for our review.

II.

THE TRIAL COURT ERRED BY NOT GRANTING VELEZ'S MOTION FOR
A JUDGMENT OF ACQUITTAL.

{¶3}   Mr. Velez asserts in his first assignment of error that the trial court erred in denying his Crim.R. 29 motion on the falsification count.  We do not agree.

{¶4}   This court generally reviews a denial of a Crim.R. 29 motion by assessing the sufficiency of the State's evidence.  *See State v. Slevin,* 9th Dist. Summit No. 25956, 2012-Ohio-2043, ¶ 15.

> "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

*Id.*, quoting *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶5}   R.C. 2921.13(A)(3) provides that "[n]o person shall knowingly make a false statement, or knowingly swear or affirm the truth of a false statement previously made, when * * * [t]he statement is made with purpose to mislead a public official in performing the public official's official function."   "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."  R.C. 2901.22(B).  "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."  R.C. 2901.22(A).

{¶6} "False statement" is not defined in the statute. However, the dictionary defines the word "false" as "intentionally untrue" and "statement" as a "single declaration or remark[.]" *Merriam-Webster's Collegiate Dictionary* 451, 1219 (11th Ed.2005). Accordingly, a false statement is an intentionally untrue declaration. *See also State v. Davidson,* 131 Ohio App.3d 607, 611(7th Dist.1998) ("Statements without grounds in truth or fact are false statements.").

{¶7} The question before the trial court as the trier of fact was whether Mr. Velez knowingly made a false statement to Lieutenant Detective Mark Carpentiere (the undisputed public official) in 2009 with purpose to mislead Lieutenant Detective Carpentiere in his investigation. After considering the evidence presented in the State's case, when considered in a light favorable to the prosecution, we conclude that, while the evidence is far from overwhelming, the State did present sufficient evidence.

{¶8} The events surrounding this case began long before 2009. David Fetter, an electrical engineer, owned two rental properties in Lorain. He purchased one of them, located at 213 Georgia Avenue, in 2006, and planned to use the property for Section 8 housing. In order to be able to rent the property, he had to obtain a certificate of occupancy, and, in order to do that, the property had to pass an inspection. On January 3, 2007, two inspectors, Mr. Velez and Keith Waters, performed an inspection. The inspectors gave Mr. Fetter a form that contained violations that needed to be rectified in order to pass the inspection. According to Mr. Fetter, Mr. Velez informed Mr. Fetter that, because there was no heat in one of the bedrooms, Mr. Fetter had to put "electrical strip heat" in to pass the inspection. Mr. Fetter testified that Mr. Velez said that, "if you want to pass the inspection, you will have to put an electrical strip heater in the bedroom" and that he "'c[ould] do the job * * * [for] between $200 and $250.'" Later in the trial, Mr. Fetter stated that Mr. Velez said, "'If you want to pass inspection, I can do this.'" And

while Mr. Fetter was capable of doing this work himself, which he estimated would take about four hours,[1] based on the way Mr. Velez "came across," Mr. Fetter felt that, if he wanted to pass the inspection, he had to have Mr. Velez do the work. Mr. Fetter agreed to have Mr. Velez do the work, and, according to Mr. Fetter, Mr. Velez indicated he would leave a form in the kitchen once the work was completed.

{¶9} Mr. Waters also testified about the 2007 inspection. He testified that he was responsible for the structural part of the inspection and Mr. Velez was responsible for the electrical portion. Mr. Waters indicated that violations were found and that, at some point, Mr. Velez and Mr. Fetter had a conversation in Mr. Waters' presence about the absence of heat in the bedroom. Mr. Waters testified that Mr. Velez said that one of the ways to fix the problem would be to install a baseboard heater and that Mr. Velez has "'put in a lot of them.'" Mr. Waters indicated that Mr. Velez never specifically offered to do the work for Mr. Fetter during the conversation.

{¶10} Mr. Waters testified that he and Mr. Velez returned to the property around 1:30 p.m. on January 5, 2007, to re-inspect it. He could not remember whether Mr. Fetter was present. At that time, Mr. Waters stated that there was a space heater in the bedroom and no baseboard heater was installed. Mr. Velez indicated to Mr. Waters that the space heater was against code. Accordingly, Mr. Waters stated that the property was not approved at that time.

{¶11} At trial, Mr. Fetter stated that he spent the day after the initial inspection, January 4, 2007, doing repairs and left the house around 3:00 p.m. He denied that he ever put a space heater in the bedroom at issue. He indicated that he was then out of town beginning the morning

---

[1] The trial court used this figure in determining how long it would take to install.

of January 5, 2007, and did not return to the house until around 5:00 p.m. that day, at which point the baseboard heater was installed and there was form in the kitchen which had the lockbox number to the house on it and stated "Electrical Approved[.]" Mr. Fetter testified that he called Mr. Velez that evening and Mr. Velez told Mr. Fetter that it was $220 for the work. Mr. Fetter then arranged to come over to Mr. Velez's home the next day, January 6, 2007, to pay him.

{¶12} Mr. Fetter testified that he and his wife went to Mr. Velez's house around noon on Saturday January 6, 2007, with $220 in cash. Mr. Fetter's wife confirmed that she went with Mr. Fetter to the Velez house that day. Mr. Fetter's wife waited in the car and Mr. Fetter was invited into the house by a woman. Mr. Fetter then asked Mr. Velez for a receipt. Mr. Fetter testified that Mr. Velez appeared "apprehensive[]" about giving Mr. Fetter a receipt but did so. Mr. Fetter identified State's Exhibit D as the document he claimed Mr. Velez gave him that day. Despite feeling intimidated into having Mr. Velez do the work, Mr. Fetter did not report anything about this incident to anyone in 2007.

{¶13} In 2009, pursuant to City of Lorain requirements, Mr. Fetter had to have the property at issue re-inspected, as two years had passed. At the time of the 2009 inspection, Mr. Fetter was out of town, and so his wife went to the property. Mrs. Fetter testified that Mr. Velez told her that the hot water tank needed to be replaced. The report containing the violation, however, only states "hot water tank broken leaking[.]" Upon hearing that the hot water tank needed to be replaced, Mr. Fetter became upset because it was new and he felt it only needed a new valve. Nonetheless, he had his wife get a building permit to put in a new hot water tank.[2]

---

[2] Ultimately, Mr. Fetter only ended up replacing a valve on the hot water tank and did not install a new one.

After he got all the paperwork, he went down to the building department and then went and talked to Phillip Dore, the director of public safety for the City of Lorain. He started to ask questions as he felt he "[was] getting singled out as a landlord in Lorain." At this point, Mr. Fetter brought up the problems he had with the 2007 inspection. After Mr. Dore spoke with Mr. Fetter, Mr. Dore was concerned that something inappropriate had happened and contacted the police to investigate.

{¶14} In November 2009, after being contacted by Mr. Dore, Lieutenant Detective Carpentiere began to investigate the allegations about Mr. Velez. After talking to both Mr. and Mrs. Fetter, Lieutenant Detective Carpentiere contacted Mr. Velez. On November 19, 2009, Mr. Velez agreed to come down the detective's bureau and talk to Lieutenant Detective Carpentiere. Lieutenant Detective Carpentiere explained Mr. Fetter's allegation that Mr. Velez "solicited $220 to install this baseboard heat at 213 Georgia, told him * * * that there was a receipt, and asked him for his side of the story." Lieutenant Detective Carpentiere showed Mr. Velez the receipt/invoice (State's Exhibit D), which Lieutenant Detective Carpentiere had received from Mr. Dore. State's Exhibit D does not contain any information, aside from the work done, that would connect the document to Mr. Fetter's home at 213 Georgia or Mr. Fetter himself. No other documents, such as the prior inspection reports containing the violations, were shown to Mr. Velez. Lieutenant Detective Carpentiere acknowledged that Mr. Velez seemed confused and agreed that he did not remember what the inspection at issue was about. Lieutenant Detective Carpentiere testified that Mr. Velez "initially denied that he did the work, denied that he wrote the receipt, but as [they] talked over the course of * * * a half-hour or so, he initially said he could have written the receipt. He also said he could have done the work for Mr. Fetter, but may have done it at another home of his." He told Lieutenant Detective Carpentiere that he would not

have done the work at 213 Georgia but might have been at another property Mr. Fetter owned. Mr. Velez further indicated that "Mr. Fetter was upset with him about the inspection of the hot water heater * * * and Mr. Fetter was making allegations to get him in trouble, to retaliate for that." Additionally, Mr. Velez told Lieutenant Detective Carpentiere that he did do side jobs but that he was not supposed to do them inside the City of Lorain, that he did not keep meticulous records of those jobs, and that he only made a few thousand dollars a year doing side jobs. Lieutenant Detective Carpentiere spoke to Mr. Velez again later that day for about 15 minutes and a similar discussion ensued.

{¶15} Lieutenant Detective Carpentiere thereafter sought handwriting samples from Mr. Velez's workplace and also got a search warrant to search Mr. Velez's home to verify Mr. Fetter's description of it and to look for handwriting samples. Additionally, Lieutenant Detective Carpentiere had Mr. Velez come in to complete documents for the purpose of comparing the handwriting on the documents to that on the receipt/invoice (State's Exhibit D). Lieutenant Detective Carpentiere described Mr. Velez as "laboring" and "struggling" over the completion of the writing samples. While the prosecution hired a handwriting expert to give an expert opinion as to whether the receipt/invoice was written by Mr. Velez, the expert was not permitted to give her opinion at trial due to the trial court determination that the expert report did not comply with Crim.R. 16(K).

{¶16} This Court does not consider credibility in determining whether sufficient evidence was presented to support a conviction and is required to view the evidence in a light most favorable to the State. We are also aware that Mr. Velez presented witnesses whose testimony would tend to contradict testimony by some of the State's witnesses, including Mr. Fetter. However, that evidence would only be relevant when considering the weight of the

evidence. We are also mindful that evidence of a person's mental state is often based upon circumstantial evidence.

{¶17} While the paucity of the State's evidence presented to support a conviction for falsification gives us pause, ultimately we conclude that sufficient evidence was presented, if believed, whereby a reasonable trier of fact could find Mr. Velez guilty of falsification.

{¶18} Viewing this evidence in a light most favorable to the State, a reasonable trier of fact could conclude that Mr. Velez immediately knew that the State's Exhibit D was his and that his statements denying authorship and admitting possible authorship constituted false statements. A reasonable trier of fact could conclude that Mr. Velez would instantly recognize his own handwriting when confronted with it, particularly after being reminded of the circumstances under which the document was created.

{¶19} Additionally, given the testimony by Lieutenant Detective Carpentiere that Mr. Velez "struggle[ed]" and "labor[ed]" over his handwriting sample, a reasonable trier of fact could have concluded that such actions were an attempt by Mr. Velez to manipulate his handwriting so that it would not match the handwriting on State's Exhibit D. Given that circumstantial evidence of possible deceit, a trier of fact could have likewise concluded that the false statements Mr. Velez made at the prior interview were also done with purpose to mislead Lieutenant Detective Carpentiere. While this evidence is far from overwhelming, we conclude that it was sufficient to sustain a conviction for falsification. Mr. Velez's first assignment of error is overruled.

ASSIGNMENT OF ERROR II

THE TRIAL COURT'S JUDGMENT OF CONVICTION ON THE
FALSIFICATION CHARGE WAS AGAINST THE MANIFEST WEIGHT OF
THE EVIDENCE.

**{¶20}** Mr. Velez asserts in his second assignment of error that his conviction for falsification is against the manifest weight of the evidence. We agree.

**{¶21}** In reviewing a challenge to the weight of the evidence, the appellate court

> [m]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

**{¶22}** Thus, in considering the weight of the evidence, we consider all of the evidence, including the portions that contradict the State's position. In the instant matter, the record is full of conflicting evidence and testimony.

**{¶23}** We begin by noting that Mr. Fetter's testimony at trial was inconsistent in several respects from the information he provided a private investigator hired by defense counsel. For example, several times during the interview with the private investigator, Mr. Fetter told the investigator that Mr. Waters was present during the alleged solicitation, while Mr. Fetter seemed less than certain at trial as to whether Mr. Waters would have heard the conversation. Additionally, Mr. Fetter implicated Mr. Waters in the scheme and told the investigator Mr. Waters was just as guilty as Mr. Velez. Yet, Mr. Fetter never mentioned Mr. Waters' alleged involvement to Lieutenant Detective Carpentiere. Additionally, there was evidence that Mr. Fetter told the investigator that he was present at the house for the re-inspection on January 5, 2007, and let Mr. Velez in, despite his testimony to the contrary at trial. Mr. Fetter acknowledged the inconsistencies in his statement to the investigator as compared to his trial testimony and averred that his trial testimony was accurate. He stated that he just "told [the investigator] what he wanted to hear to get him out of the house."

{¶24} With respect to Mr. Fetter, the trial court stated that, "except for what has been corroborated by someone else or an exhibit, I don't find Mr. Fetter to be credible in that regard." The trial court concluded that Mr. Fetter's testimony "with regard to * * * what took place in his interview with [the investigator], not to be credible." Further, the trial court stated that it "found the complaint with respect to the inspection * * * of the hot water heater not to be credible." The trial court also did not find any credible evidence that "Mr. Velez squeezed [Mr. Fetter] or shook him down[.]" Nor could the trial court find that Mr. Velez was paid anything above the actual value of the work he was claimed to have provided. After making these findings, the trial court dismissed the first and third counts of the indictment.

{¶25} Additionally, we note that Mr. Waters himself did not perceive the conversation between Mr. Velez and Mr. Fetter as concerning anything illegal. Mr. Waters denied that Mr. Velez offered to do the work for Mr. Fetter and said that, if that had happened Mr. Waters would have found that inappropriate and would have reported it. Instead, Mr. Waters testified that Mr. Velez said that one of the ways to fix the problem would be to install a baseboard heater and that Mr. Velez had "'put in a lot of them.'" Mr. Waters was adamant that, "if anything had happened illegal in front of [him], [he] would have reported it." The trial court found both Mr. Waters and Lieutenant Detective Carpentiere to be credible witnesses.

{¶26} Also relevant to our manifest weight analysis, Mr. Velez presented witnesses in support of his position. First, there was testimony concerning Mr. Velez's payroll record for January 5, 2007, which indicated that Mr. Velez was working for the City of Lorain until 3:30 p.m. This testimony would tend to negate the possibility that Mr. Velez installed the baseboard heater at 213 Georgia, as it would tend to show that Mr. Velez would not have had time to do so on the Friday it was allegedly installed. As of 1:40 p.m. on January 5, 2007, Mr. Waters testified

that the baseboard heater was not installed. However, as of approximately 5:00 or 5:30 p.m. that day, Mr. Fetter maintained that the heater was installed. If Mr. Velez was working for Lorain until 3:30 p.m., he would not have been able to complete the work.

{¶27} Mr. Velez additionally presented the testimony of three witnesses whose testimony tended to discredit Mr. Fetter's allegations that Mr. Velez wrote a receipt for Mr. Fetter at Mr. Velez's home on January 6, 2007.

{¶28} Mr. Velez's then-wife, Denise Velez, denied that Mr. Fetter came over that day and testified that she was home all day. She also testified that she had never seen Mr. Fetter before the trial. While Mr. Fetter was able to draw the general layout of the residence at trial, Ms. Velez indicated that it was not completely accurate. She also stated that, at the time of Mr. Fetter's alleged visit, she had a dog and a parrot, both which tended to be noisy when guests visited. Mr. Fetter did not remember whether there were any pets in the house; however, he did remember that the cabinets in the Velez house were an "ugly brown[,]" a fact that Ms. Velez refuted. Ms. Velez testified that her cabinets had never been brown and had always been white.

{¶29} Santos Cruz-Plaza testified that, at the time of trial, he had known Mr. Velez for over 20 years and that he helped Mr. Velez with some of Mr. Velez's side jobs. Mr. Cruz-Plaza stated that from approximately 9:00 a.m. until approximately 6:00 p.m. on January 6, 2007, Mr. Velez and Mr. Cruz-Plaza were at a North Ridgeville Marathon gas station. Mr. Cruz-Plaza indicated that Mr. Velez was there to do electrical work related to installation of a coffee machine and Mr. Cruz-Plaza assisted him by handing him tools. Additionally, Mr. Cruz-Plaza testified that he went with Mr. Velez the night before around 5:00 or 6:00 p.m. to purchase supplies for the job.

**{¶30}** Further, Jamal Abdelhamid, the owner of the Marathon gas station, also testified. He indicated that Mr. Velez did electrical work for the new gas station building. Mr. Abdelhamid verified that Defense Exhibit 11 was a bill he received from Mr. Velez and that the bill was dated January 6, 2007. While Mr. Abdelhamid did not remember specifically whether Mr. Velez performed work that day, he stated that Mr. Velez would always give him a bill when he completed a job. Further, he indicated that Mr. Velez would usually do the work on a Saturday or a Sunday and that he sometimes had an assistant with him. Notably, the trial court found that Mr. Velez was in fact in North Ridgeville on January 6, 2007.

**{¶31}** Following identification by Mr. Abdelhamid, two exhibits, Defense Exhibit 11 and Defense Exhibit 12, were admitted into evidence. These exhibits were bills Mr. Abdelhamid testified he had received from Mr. Velez. Both of these exhibits contain Mr. Velez's signature and indicate the location where the work was performed. While it is true that the two invoices differ from each other in that one is completely type-written (aside from the signature) while the other contains a mixture of typing and handwriting, both use a similar format which is different from that employed in State's Exhibit D. Moreover, State's Exhibit D does not mention Mr. Fetter or contain the address of the property at issue, despite Mr. Fetter's assertion that State's Exhibit D was the receipt provided to him by Mr. Velez for the work Mr. Velez allegedly did at 213 Georgia. Ultimately, in light of all the conflicting information, the trial court could not even conclude beyond a reasonable doubt that Mr. Velez actually did the work connected to State's Exhibit D.

**{¶32}** In light of the foregoing, including the trial court's credibility determinations and findings, we conclude that a manifest miscarriage of justice occurred when the trial court found Mr. Velez guilty of falsification. While the trial court concluded Mr. Velez did author State's

Exhibit D, this finding is somewhat concerning given that the trial court also found that Mr. Velez was in North Ridgeville at the time Mr. Fetter alleged that Mr. Velez was at his home writing out a receipt for Mr. Fetter. This apparent inconsistency is particularly troubling given the complete lack of evidence that this receipt was created at some other time or place. Nonetheless, even assuming that Mr. Velez did author this receipt, it is against the manifest weight of the evidence to conclude the Mr. Velez knowingly made a false statement concerning that document with purpose to mislead Lieutenant Detective Carpentiere.

{¶33} While the trial court concluded that Lieutenant Detective Carpentiere did not ambush Mr. Velez in his questioning, there was testimony that was not contradicted that Mr. Velez appeared confused during the questioning. The exchange reveals that Mr. Velez appeared confused about the matter at hand as well as the document and then as the conversation ensued, he informed the detective that is was possible he could have done the work at a different location. While Lieutenant Detective Carpentiere did inform Mr. Velez about Mr. Fetter's allegations prior to showing him the receipt/invoice, the receipt/invoice was the only document that Lieutenant Carpentiere showed Mr. Velez. None of the related inspection documents were provided to Mr. Velez during the interviews at issue. The receipt/invoice that was shown to Mr. Velez does not even mention Mr. Fetter or contain the address of the property at issue. Moreover, a large portion of it is typewritten and it does not contain Mr. Velez's signature, something that would likely be easily identified by Mr. Velez. Nor did it contain information that would tie the document to the actual work he was being questioned about. Further, the receipt/invoice at issue differs in many ways from invoices that were identified as being prepared by Mr. Velez. For example, both of the invoices submitted by the defense in its case contain Mr. Velez's signature and indicate the location where the work was performed. Also, as discussed

above, both use a similar format which is different from that employed in State's Exhibit D. Given these differences, even assuming that Mr. Velez authored State's Exhibit D as claimed by Mr. Fetter, we cannot conclude that it was reasonable for the trier of fact to conclude that Mr. Velez knowingly made a false statement when he was called down to the police station and then asked about an incident and a receipt/invoice from over two years ago, initially denied he authored it, and then said he might have. It is difficult to conclude that, under the circumstances, a reasonable person would be certain immediately that such was a document was made by him or her when such a long time had elapsed and the document did not look like other documents he or she typically produced. In other words, the weight of the evidence does not support the conclusion that Mr. Velez made an intentionally untrue declaration to the detective. However, even assuming the trier of fact reasonably concluded that Mr. Velez knowingly made a false statement to Lieutenant Detective Carpentiere, we conclude the trier of fact lost its way in concluding that Mr. Velez's purpose in doing so was to mislead Lieutenant Detective Carpentiere in his official function. If anything, from the course of Mr. Velez's conversation, and given the information that Mr. Velez did supply to Lieutenant Detective Carpentiere, such would have only caused him to further investigate Mr. Velez. While Mr. Velez initially denied creating State's Exhibit D, he later, within the same conversation, admitted he might have, and also stated he might have done the work at issue, albeit at a different location. It is true that Mr. Velez never admitted to doing the work at 213 Georgia; however, the trial court itself could not conclude beyond a reasonable doubt that Mr. Velez actually did the work at that location either. We are aware that the statute does not require that Mr. Velez actually misled Lieutenant Detective Carpentiere; nonetheless, in light of the circumstances, the weight of the evidence does not substantiate that such was Mr. Velez's purpose. There was no testimony that Mr. Velez was

evasive or that he materially changed his version of events when speaking with Lieutenant Detective Carpentiere. And while circumstantial evidence could provide support for the conclusion that Mr. Velez had an improper purpose, *see, e.g., State v. Westfall,* 9th Dist. Summit No. 22898, 2006-Ohio-4729, ¶ 16-17, the circumstances of this case do not support that conclusion. Instead, the basis of the charge at issue began with accusations by an individual generally not deemed credible by the trier of fact which ultimately led to a police interview of a man who was uncertain about his involvement in a routine inspection from two years prior. The evidence presented in this case creates a picture of doubt and confusion, and, after a careful and thorough review of the record, we conclude the trier of fact did lose its way in finding Mr. Velez guilty of falsification. Thus, we sustain Mr. Velez's second assignment of error.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN ADMITTING THE DISPUTED INVOICE, STATE'S EXHIBIT D.

{¶34} In light of our resolution of Mr. Velez's second assignment of error, this assignment of error has been rendered moot. We decline to address it on that basis. *See* App.R. 12(A)(1)(c).

## III.

{¶35} We overrule Mr. Velez's first assignment of error and sustain his second assignment of error. His third assignment of error is therefore moot, and we decline to address it. We affirm in part and reverse in part the judgment of the Lorain County Court of Common Pleas and remand the matter for proceedings consistent with this opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

EVE V. BELFANCE
FOR THE COURT

WHITMORE, J.
CONCUR.

CARR, J.
CONCURRING IN PART, AND DISSENTING IN PART.

{¶36} I concur that the trial court's judgment must be reversed, but I respectfully dissent as the State failed to present sufficient evidence to support the falsification charge. At most, Velez's statements to police were confusing and ambiguous. Moreover, even assuming that Velez's statements to police were unambiguous and false, the charge of falsification would still fail under the "exculpatory no" exception. In other words, general denials or other exculpatory responses to law enforcement are insufficient to constitute falsification. *See State v. Marshall*,

5th Dist. Fairfield No. 97CA52, 1998 WL 401849 (Feb. 25, 1998). The exception was widely recognized by federal courts as a general principle of law until 1998 when the United States Supreme Court rejected the defense in *Brogan v. United States*, 522 U.S. 398 (1998). Nonetheless, the Supreme Court of Ohio has yet to rule on the exception's applicability under Ohio law.

<u>APPEARANCES:</u>

BRENT L. ENGLISH, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and MARY R. SLANCZKA, Assistant Prosecuting Attorney, for Appellee.